All right, we call the last case on the docket this morning, it's Yates v. Livingston. We call the last case on the docket this morning, it's Yates v. Bailey. We call the last case on the docket this morning, it's Yates v. to the inmates at the PAC unit. Specifically, the district court erred by holding that a risk that in itself defined as minute and slight could be considered a substantial risk within the meaning of the 8th amendment, and further erred by holding that prison officials could be deliberately indifferent despite the fact that they have consulted with and followed the advice from the experts at the empowered environmental regulatory agency in their state. These two notions are fundamentally incompatible with this court's 8th amendment precedent, and TDCJ requested this court reverse. Before I delve into the merits of the 8th amendment issue, I'd first like to address the jurisdictional issue that has come about due to the plaintiff's conscious decision in this case not to extend the preliminary injunction, even though the very conditions that they complained of are still present on the unit, conditions that they complained created a life-threatening emergency. The defendants in this TDCJ in this case can sense that this case is capable of repetition, yet evading review, and that is an appropriate exception to the mootness doctrine that warrants this court deciding this issue on the merits. And that's because TDCJ operates over 100 prisons across the state of Texas, each with their own different water supply and water system, and there are issues that are reasonably likely and virtually certain to occur in the future in any one of those systems. Is it appropriate, though, in considering mootness of this case to consider that some other case in some other prison involving some other prisoner might arise? Yes, Your Honor. It is under the capable of repetition and evading review standard. What's your best case for that? Well, I would cite to Catholic Leadership Coalition of Texas v. Reisman, in which this court held that there doesn't have to be a certainty that the issue is going to arise again. There has to be a reasonable likelihood, and we do see that in, actually, the record in this case. After the district court entered its preliminary injunction, inmates at another prison that's even outside the jurisdiction of the Southern District wrote in to the judge in this case and said, we should be entitled to bottled water as well. But actually, the documents they submitted to the district court confirmed exactly what had happened there, which was in 2015, there was a temporary elevation in a coliform sample that was resolved in a matter of weeks. It never reached acute levels, and it resolved quickly the question of whether prison officials have a duty under the Eighth Amendment to supply alternate water, even where the regulatory agencies tell them they don't need to, would have arisen in that case just as it's arisen here, and it would escape review for any one of three reasons. First, the issue might resolve itself, or it might be resolved very quickly, just as it was in the instance that we see in the record. Or it could be because if this rule of law is somehow cabined into the summer months, then we see a situation where the summer months are going to expire, the injunction will escape review just as it's doing here. The 90-day provision to the limit on injunctions in the PLRA is also another factor that can lead these issues to arise and dissolve quickly before it could escape review. And the notion that prison officials can be held deliberately indifferent even when they're following the advice of the Texas Commission on Environmental Quality, which has specifically said you do not need to seek an alternate water source, this is not an emergency, is so completely foreign to this Court's precedent, I think every prison official in the Fifth Circuit would have believed they're doing their duty if they're following the advice of the regulators in their area. It's for that reason and similar reasons that this case also applies for the collateral consequences exception. And under that exception, if there is a substantial question about the rights of the parties moving forward, even if the actual issue has been mooted, the Court can have jurisdiction to go ahead and decide that when it's worthwhile to do so for the parties to gain clarity of their rights moving forward. But does mootness extend to a situation where the issue may arise between different parties, between different plaintiffs? In other words, I'm thinking mootness involves a likelihood of repetition of a case between this plaintiff and this defendant. Well, this plaintiff is specifically, as a class, the inmates that are housed at the PAC unit. There is a fluid prison population in the state of Texas, and so the rule of law that's created by the District Court, even if it's limited to the PAC unit, will provide that same level of uncertainty and unclarity between inmates in general and the prison system in general. I'm sure you can find different levels of different minerals in a number of the different units. Absolutely, Your Honor, and there's a huge number of elements that are regulated by the EPA, and just the fact that the water system is out of compliance with one would, under the District Court's holding, trigger a duty to provide alternate water, even though the regulatory officials aren't advising that it's necessary. And so in that way, that uncertainty that's in the law that's been created by the District Court's opinion is a collateral consequence,  but in the alternative to those two, TDCJ contends that it would be entitled to a vacator here due to the fact that the injunction expiring or the mootness that's arisen here is not due to their own making, and that stems from the Supreme Court's holding in Munsingware that was affirmed by the Supreme Court in U.S.-Bancorp v. Bonnar Mall Partnership, in which the Supreme Court held that if there is an injunction that's appealed and the party that is the appellee in the action takes action that moots the case, the appellant is entitled to a vacator. So they're not bound by a judgment that they sought to review, but their efforts were thwarted by the actions on the other side. And that's what we see in this case, whether it's due to the affirmative action by the plaintiffs or whether it's due to— I mean, that's what's so crazy about this case. Your new system is going into effect in February, right? Yes, that's what's projected. And if the new system were not going into effect, you would still be in compliance with EPA rules or at least no danger,  They're willing to subject their plaintiffs to a risk for the next four months because they know that relief is in sight. Well, I don't think it could be overlooked that the plaintiffs have a motion for $1.4 million in attorney's fees pending in the district court based specifically on the grant of this injunction. And so I'll leave it to my colleague on the other side to answer as to why they would not want to seek to instigate the injunction, even where they've claimed the water is literally poisoning them. But the collateral—I'm sorry, under the vacator rule, TDCJ would be entitled to a vacator because it is not their actions that have mooted this case, whether it's due to the passage of time and circumstances or whether it's due to the affirmative actions on the other side. Both of those contexts entitle TDCJ to a vacator here. How has the state—has the state confirmed that it will build a filtration system and implement it in February? Yes, Your Honor. Is that pursuant to an order by the environmental authorities? Well, yes and no. I mean, this process has been in motion for a number of years, and the TDCJ undertook to fix this problem long before this case was even contemplated. So there's actually evidence in the record that removing these types of low levels of arsenic is a very difficult matter from an engineering perspective, and TDCJ has tried a number of things over the years to get this system to be in compliance that haven't quite gotten us there. But the ultimate solution will come in this filtration system. There was a new system put in in 2007, right? Yes, Your Honor, there was. And it's been under modification and adjustment ever since. They attempted to troubleshoot it. They tried to tweak it in different ways. When that couldn't get the—it got the water just above 10, they considered other options like drilling new wells, like tapping into the city of Navasota's water, which the city denied. So TDCJ has been working to fix this problem. But turning to the Eighth Amendment analysis, the Supreme Court's holding in Helling v. McKinney defines what the inquiry is in cases dealing with an environmental contaminant in the context of the Eighth Amendment. And what the Supreme Court held in Helling was that there has to be three showings to show an Eighth Amendment. First, there has to be a scientific and statistical inquiry into the harm and the likelihood that it will occur. There has to be a showing that that risk, as defined in the first part of the inquiry, is one that our society considers so grave that it would not prohibit exposing to anyone unwillingly. And there also has to be a showing that the prison officials have been deliberately indifferent. And we see that the evidence here negates all three of those factors. In terms of the scientific and statistical inquiry, the district court here adopted the risk assessment of the defense expert, Dr. Heidi Boyce. And for clarity, she's actually not with the Texas Commission on Environmental Quality. She's with a different state agency, the Department of State Health Services. And she calculated the possible risk due to the arsenic levels that are present at the PAC unit. And what she determined was even assuming a number of worst-case possible scenarios. Over a two-year exposure period, she calculated that it could theoretically cause 3.4 cases of cancer in a population of 100,000 people. Stated numerically differently, that's just under a one-in-30,000 chance. And in terms of the scientific and statistical inquiry that the Supreme Court prescribed in Helling, there is no authority that I've been able to identify or that the plaintiffs have identified that such a low level of risk requires action under the Eighth Amendment to abate that risk. It's simply too remote. And a good reference point for that comes in the environmental tobacco smoke cases, where we see routinely what's cited as a surgeon general's warning and a study that showed in environmental tobacco smoke, you have a 20% to 30% increase in getting cancer. A one-in-30,000 chance translates into .0034. So in context, we see the level of risk is below anything this court has ever sustained. In addition, the contemporary standards of decency here do not call for alternate water. And that's because there are hundreds of water systems across the country that are still above the EPA's standard of 10 parts per billion. Yet no regulatory agency and no court has ever ordered any of those systems to provide bottled water. And that's why the district court's order here stands as such a complete outlier to what any other entity has held. There's another fact that's relevant in terms of the contemporary standards of decency, and that's when the EPA first announced it was changing the standard from 50 parts per billion to 10 parts per billion. It also announced that it would be providing up to 14 years of extensions for systems to come into compliance with that standard. And that reflects the judgment, the expert judgment of the EPA, that that kind of time period for drinking water above 10 parts per billion is not a risk and it's not an emergency. And it's never been higher than about 29 parts per billion in this unit, right? No, there have been periodic measurements that were, I think, as high as 40 over this 10-year period. But the 10-year average is, I believe, 26 parts per billion. And actually, the current level, which I think is the most relevant number as the injunction's moving forward, it's at 19 parts per billion. So what we see here is a risk that the experts themselves have identified as so minimal as to not require this alternate water that the district court ordered. EPA has not required it either, has it? No, Your Honor, it has not. And in fact, the expert from the Texas Commission on Environmental Quality couldn't identify any instance in which it ever has anywhere across the country. But you don't actually just have to take the state of Texas' word for this, and that's why we've cited to the cases involving the Kern Valley State Prison in California, where the Eastern District of California considered claims nearly identical to what's been argued here. And experts from California offered the very same advice that the experts have offered here, that this is not a risk in the short term or even medium term. This is a hypothetical risk in terms of long-term, lifetime exposure, and that even scientific studies aren't showing that this risk is manifesting itself in certain communities. I'd also like to touch upon the elements necessary. Well, before I move away from the Eighth Amendment, there's also the problem of the subjective part of the inquiry. And it's just entirely foreign to this Court's precedent that officials could be following the advice of the experts from the regulatory agency in their state. The District Court really didn't explain the deliberate indifference finding, did he? No, I couldn't find that in the opinion, and I think that's because it's just so inconsistent with that notion of how a prison official could not be doing their job when they're following that advice. But also in terms of the fundamental legal error the District Court made, we see that separate and apart from the Eighth Amendment, in the standards necessary to obtain a preliminary injunction, the Supreme Court held in Winter v. Natural Resources Defense Council that the showing of irreparable harm isn't just that it's possible, it has to be likely to occur. The District Court committed a fundamental error by holding that there was a substantial threat, but fundamentally the concept of a minute and slight risk is incompatible with the duly applicable standard that the irreparable harm be likely. And I see that my time has expired. If there's no more questions, I'll reserve the remainder of my time. Okay, thank you, Mr. Greer. All right, Mr. Edwards. Thank you. If I could briefly address the mootness issue. There is no longer a preliminary injunction in effect. Isn't that your fault? No, it's not. Judge Ellison considered the evidence and on June 21st issued an order that went into effect on July 6th. He issued a 78-day injunction for the entirety of the summer. Well, you know as well as I do that in Texas the high temperatures persist basically through October, perhaps in unusual circumstances. And if your clients were subjected to such a horrible risk, it was in their best interest for you to seek a continuation, which I'm sure he would have granted immediately, right? Well, I'm not sure that he would have granted it immediately because the evidence does not show that the prolonged exposure, which is fundamental to his ruling, is going to continue. In fact, in Navasota, Texas, the high yesterday was in the low 80s. I think it might have been 77 degrees, and I'd ask you to take judicial notice of that effect. I'm not disputing that it doesn't get hot in October, but the case that we brought was that there are dangerous temperatures during the summer months. And because there are dangerous temperatures during the summer months and because the Texas Department of Criminal Justice's key principle and chief measure is the overconsumption of water, two gallons a day, then that water must be safe. And so the issue of whether or not that injunction was our fault that it lapsed, Judge Ellison did not issue a 90-day injunction going into October. He issued a specific injunction that ended in the summer. I'm sorry, Your Honor. Well, why is this not capable of repetition? Why doesn't this fall into the exceptions capable of repetition or collateral consequences? Given that, once you establish this precedent at the court of appeals level, first, well, no, at the district court, but it's mooted out, first case in the entire country, whole state of Texas is hot, 100 prison units, that becomes a relevant precedent as to the TDCJ. I'm sorry, but I— Why is it not capable of repetition yet evading review? It's not capable of repetition yet evading review in this case because TDCJ has affirmatively stated they are going to put in a filtration system  All you have to do is go around and test the water at all the other 100 units, and you may find undue sulfur in south Texas, or you may find an elevated level of iron or an elevated level of mercury or something like that. So then you'll sue everywhere. No, we won't, but you may. I mean, I'm not going to dispute that there may be other chemicals in water, but in order for the mootness doctrine, in order for the capable of repetition yet evading review doctrine to be in place, it has to be the same parties. Here the plaintiffs brought a case— Where's your evidence of that, that it has to be the same parties? Well, you can look at the Sossaman case. You can look at the Staley case. Well, I mean, it may be implicit, but I don't see a specific holding, and it is the same defendant, and it is—prisoners change. They even go in and out of the PAC unit, so you have a class action on behalf of an unnamed, inspecific group of plaintiffs. The facts and circumstances change at each of the prisons. The temperatures may be different. The remedial measures may be different. Again, this case at its core is a combination case. It is a case about dangerous temperatures, which requires as a constitutional mandate there to be remedial measures in place which adequately protect the inmates. The measures that here they have chosen are to provide a dangerous level of water. And because it has elevated levels of— Dangerous. Because it increases the risk of cancer. Excuse me, sir. Until 2001, the standard was 50 parts per billion. Does that mean that the EPA was deliberately exposing the entire American public to elevated risk of cancer? It doesn't mean that they were deliberately exposing it. Well, they were, according to you, because the average level is now half that at this prison system. Well, I think the key is that as science progresses and as the studies confirm that there is a risk of cancer, regulatory bodies make changes. The EPA in this particular instance decided that the safe level, in light of the cost-benefit analysis, because there really is no safe level of arsenic, was 10 parts per billion. When you go above that, in this particular case, the evidence in this record shows that— There is only generic evidence in this record. There is no specific generic evidence, being the only thing that the judge focuses on in his opinion is Dr. Boyd's testimony, which the judge himself characterizes as minute and slight, and he uses some other diminutive, which does not rise to the level of a substantial risk, A. And, B, he has no factual support, in his opinion, as best I can tell, for the finding of deliberate indifference. Well, I think that the court ought to take a look at the findings that pertain to the heat, which are completely unchallenged by the TDC— We're not talking—this is not the heat case. Your heat case may not even have been tried yet, for all that I know, but that's certainly not part of this appeal. This appeal is the risk of arsenic causing cancer to these inmates, and the judge just said they're deliberate— he said in one sentence they're deliberately indifferent, but we know that they're changing out the water system right now, that they put a new water system in in 2007, that they've been repeatedly given advice by EPA and TCEQ and never found to be in noncompliance or in any kind of emergency or remedial situation. Well, Your Honor— Isn't that all true? No, it's not, Your Honor. Of course it's true, but you have something that you would oppose to that. Well, you just said that they've never been found to be in noncompliance by the TCEQ or the EPA, and that is flatly false. For 40 different quarters, in the better part of 10 years, they've been found to be in noncompliance with the EPA. They're not in— Excuse me, Your Honor. Because they get a form letter from the TCEQ which says this is not an emergency, that is not analysis or consultation with a regulatory body, and what's significant about that is while the EPA and the TCEQ may have authority to set a standard and may have a mandate to talk about water quality, what they do not have a mandate for is to determine the safety and the constitutional conditions in prisons, and here you cannot separate the heat from the arsenic in our case. We did not bring a Clean Water Act case. You cannot isolate the arsenic and pretend the heat doesn't matter because it is the heat. But Judge Ellison did. No, he didn't. Yes, sir, he did because his case is based on—your preliminary injunction is based on elevated arsenic and the fact that they drink more water. Well, everybody drinks more water in the summer, so, I mean, you know, except that you— Let me ask you this. But, Your Honor, that premise is false. Let me ask you this. How do you deal with—we're talking about if there's a substantial risk. Correct. The expert said that these prisoners drinking the amount of water they drink have likelihood of cancer of .0034. I mean, how is that a substantial risk? Well, you have to evaluate the term substantial risk in terms of the magnitude of the injury along with the probability of injury. Because the risk is an elevated risk of cancer, that alone would be substantial. But, again, the problem here is the risk of heat stroke and cancer because what they've set up here is a dangerous catch-22 for the inmates. It is undisputed by TDCJ that the temperatures are dangerous. Our whole case, the foundation of this preliminary injunction, is premised on the temperatures being dangerous and then needing to remediate. All Judge Ellison said— The only relevance I saw in the case as far as heat was it caused them to consume more water, and the water is the case we have. Well, the water does cause—they're encouraging inmates to drink two gallons of water that have elevated levels of arsenic, which they know will cause an increased risk of cancer. They know that. But even given that, the expert said it was a .0034 risk. The expert said it was— Because she assumed all the worst-case scenarios. She didn't assume the worst case—well, we can debate what scenarios that she did debate. Extreme scenarios. Again, inmates have been in that prison system for 10 years. Mr. Branham, one of the inmates that's brought this— Well, and unfortunately—I mean, you know, fortunately, you can't prove a single incident of even plausible illness, whereas with secondhand smoke, at the very least, you can get bronchitis and that sort of thing. If the court chooses to ignore the evidence relating to the substantial risk of harm from heat— and it should not do that because that is the key to this case. It is premised—it's a combination. These factors are mutually reinforcing. You have the high levels of heat. You choose to remedy that with unsafe water. Even in Baldy-LeBlanc, even in Gates, there was a requirement that water be provided to the inmates. Implicit in that requirement is that the water be safe. Here, the water is not safe. And what's worse is they're forcing inmates to make a choice. Don't drink it. Or buy bottled water at the commissary. I think Judge Ellison handled that very respectfully. What did he say about that? He said that it was unrealistic to expect an impoverished class of inmates to do what TDCJ ought to do on its own in order to protect the health and safety of the inmates. I don't think that's a completely—you know, it's obviously not a dispositive issue, but they do have a footnote that say it was well within the means of several of these plaintiffs to buy an occasional bottle of water and therefore significantly reduce their risk. Well, and it may be within the means of an occasional inmate to buy a blanket when the temperature is 20 degrees in Wisconsin, but we don't force that upon inmates. What we do when we imprison and take away the liberty of people is we take on some responsibilities. And one of the responsibilities we take on under DeShaney and under all of the cases is the responsibility to take care of and protect the well-being of the inmates. And here it is simply not true that for 10 years they have been actively involved with an agency to remedy this problem. What they've done is for 10 years intentionally expose inmates to a known risk of cancer Where is the deliberate indifference? They are aware that the water they are providing increases the risk of cancer. We would no more serve blankets that are laden with asbestos than we should be exposing inmates. I mean, just going back to deliberate indifference, this knowing exposure for 10 years is after they put in a new filtration system. Which they knew didn't work. And EPA said when it brought in the 10 parts per billion that it could take up to 14 years for these problems to be remedied. Now isn't that both evidence of the substantiality of the risk and against a finding of deliberate indifference? No, it's not, Your Honor. Because even taking the math from 2001 to, it would take us to 2015. But that being said, the EPA has a mandate to deal with water issues. But excuse me, they're supposed to be taking public safety into account. And if I get my water bill twice a year from the water authority that serves our area, and they say here's the mineral risk, and some of this may be a little elevated, but it's not an emergency or it's not unsafe or whatever. The same would have been the report for this prison system according to EPA's guidance. Is that not correct? Yes, and the report would also say that this can cause cancer and you should consult your doctor. And did TDCJ tell that to the inmates? No, they did not. Did TDCJ tell the doctor that was treating the inmates about the increased level of arsenic? No, it did not. That is not the act of a responsible agency caring for inmates. But we go back to the beginning. Did Judge Ellison find that there was a substantial risk of harm from the heat at these temperatures in this prison system? Not in some other prison system, in this prison system. He did. No, he didn't. He just found that it's hot and they have to take water and that the prison recommended two gallons, which is… He found that there was a substantial risk of harm from the measures in place. Well, the prison… Which included the arsenic-laden water. The prison doesn't deny that heat poses risks. The prison system doesn't deny that you have to take measures to counteract those which have been specified in Gates and repeated in Ball. The question is whether this particular water was added an additional level of risk. And I do think Judge Ellison understood all that. And Judge Ellison put it simply. He thought that given that there is a requirement to provide water, that it ought to be safe water. And it ought to be water that meets EPA guidelines. And that this is not a situation like the cases cited by Defendant's Counsel in California where we're talking about a two-year period. This is over ten years. And you have to evaluate. When you talk about deliberate indifference, the time in which they knowingly expose inmates to this matters. The awareness of the risk matters. And since 2006, this notice that they claim is so key to this case has explained that this may cause cancer. That there is a cancer risk. That you have to consult with your doctor. And they haven't done that. They didn't even tell the doctor. And what makes this all the worse is that the PAC unit, like Judge Davis, unlike some of the other 90, 100 other units, is a geriatric prison unit. Full of the sickest old people in the Texas prison system. And what the law says is when you have mutually enforcing conditions of confinement, and here they do mutually enforce one another. You have the dangerous heat, which forces inmates into the conundrum or the catch-22 of what do I do? Do I drink water that can increase the risk that I develop cancer when done over extended periods of time? And the numbers are higher, Your Honors, when you evaluate it over a nine-year period. They know there's an elevated risk of cancer, but they're purposely subjecting them when the burden to fix the problem is minimal. Well you, now wait a minute, you first got these reports in January of 2015, didn't you? We first found, we first took the deposition of the expert who confirmed that there was an increased rate of cancer, I believe in late January of 2016. It might have been February, but let's say January 2016. If the court wants to criticize us for not moving for an injunction sooner than May, by all means. But the fact of the matter is, it is unconscionable to serve water that you know increases the risk of cancer in order to compensate for a dangerous condition that the court did find caused a substantial risk of harm. And that this court has held repeatedly since Gates, Blackman, Ball, that these temperatures do cause real risk and real harm, a substantial risk of harm, because the risk is potential heat stroke or potential heat injury. And as Wilson B. Sider makes clear, or as it was well argued in that, the magnitude of the risk must be considered with the frequency or the probability of the risk. We are not talking about colds. Should the attorney's fees be considered in regard to the frequency of the probability of the risk? The attorney's fees should be considered if the court considers us a prevailing party. We went into court to seek an injunction to protect inmates from the dangerous summer heat. The court determined that at bare minimum the inmates deserve to have safe drinking water. That we're arguing that the water shouldn't be safe is frankly difficult for me to believe. But that's what the court found. And so we sought an injunction for the summer of 2016 and we obtained that. So to the extent this court or Judge Ellison determines that we're a prevailing party, we would seek our attorney's fees. I really think that it's a red herring and a side issue. But as to the notion that the EPA made some decision, they do not have a constitutional mandate to consider housing conditions in the Texas prison system. And they did not pass that advice along. Basically, those prisoners would be entitled to better water than I get. Only if the water... If I'm in one of those little municipalities that isn't yet in compliance with the 10 PPP. My time is up, but may I respond? You can respond. Your Honor, if you are in one of the 0.8% of districts that have water above 10 parts per billion, then you too would be subjected to a risk. However, what differentiates that example from the example facing the inmates is that you do not live in 95 to 100 degree temperatures for 43% of your hours in the summer. You do not face the ever-present, all-encompassing risk of heat stroke. Thank you. Okay, thank you, Mr. Edwards. Okay, back to you, Mr. Greer. I'd first like to address a couple points that my colleague on the other side made. And I'd first like to address this issue of the interaction between heat and water. The water does not affect the temperatures. I don't think you need to trouble yourself with that. We understand the fact. Very well, thank you. The only thing that I'll add is there's no evidence in the record that whatever increase in consumption happens in the summer changes the risk level from one that was constitutional in the non-summer months to one that's unconstitutional in the summer months. There's no evidence of that and no basis to hold that in the record. What I'd also like to point out is that this issue of the EPA's determination of a safe level and that this is just some kind of form letter or some kind of casual suggestion, there is ample evidence in the record that TDCJ has worked hand-in-hand with TCEQ throughout this process. So it's not just a matter of what's in the public notice, even though that is a substantial part of what informs TDCJ, but it's also the regulatory process that's taken place over the last several years. And in that correspondence about the compliance issues and the filtration systems, there's no evidence that TCEQ ever offered different advice that this is not an emergency and that they don't need alternate water. I'd also like to point out that my colleague on the other side said they did not bring a Clean Water Act case, and I think that's notable because there are remedies under the Safe Water Drinking Act, under 42 U.S.C. 300J-7. But the review in those cases is a review of arbitrary and capricious of the agency's determinations in terms of timelines or risk abatement. And that reflects the judgment of Congress, the judgment of the courts, that courts defer to the judgments of the regulatory experts. And that's exactly what TDCJ did here. Mr. Edwards has over and over said the water is unsafe, but that's based on his subjective definition. TDCJ is entitled to rely on the definition of the regulatory authorities that control in their state, which are telling them that the water is safe. My colleague on the other side also suggested that somehow cancer alone means that there is some kind of untethering or not need to show a substantial risk. And that's simply not supported in the case law. There has to be both a substantial risk and serious harm. And we're not arguing that cancer isn't a serious harm. We're arguing that the likelihood that that will occur is so low in this case that it's not cognizable under the Eighth Amendment, and there's no precedent to support that. I'd also like to clean up one little fact about the timeline that my colleague offered, which had to do with the 2001 to 2015. The water was actually tested at the PAC Unit in 2003, and it tested at seven parts per billion, which was within the regulatory standard. It wasn't until late in 2006 that the first test showed an elevated level above 24. In 2006? Correct. And how long is this case? I mean, so when did they file a motion here? Just this last summer. And I'd also like to point out a couple other things. How long did they know about the elevated arsenic? The inmates themselves first filed a grievance about this in 2011. The plaintiff's counsels were asking questions about arsenic in depositions virtually from the start of this case. So the notion that either they are not informed or they just learned this at the last minute, I don't think that's supported in the record. And their own expert gave an opinion in, I believe, October of 2015, which addressed this arsenic issue. So the idea that there was some new surprise I don't think can be supported in the record. But what I think has happened here is the same problem that Judge Jolly identified in his dissent in the Mullinex v. Luna case. And that's where, with respect to his colleagues, they had determined a subjective outcome and then tried to work backwards to fit the law to meet that subjective outcome. And I think that's what's happened here. Because fundamentally, a risk that can only be defined as minute and slight is fundamentally incompatible with the notion of a substantial risk. The Supreme Court in Bays v. Reese characterized the test under the Eighth Amendment by saying, sure or very likely to cause- tailored to the period in which inmates would be drinking more water. First, I think that would be an excellent argument for why it's going to escape repellent review in the future if we're somehow going to cabin this rule of law to the summer months. But in addition to the vac- I see that my time has expired. May I complete my answer? But in regard to the vacator issue, what the Supreme Court held in U.S.-Vancourt v. Bonner-Mull Partnership is that also when an injunction expires due to the passage of time or just a change in circumstance that's not on the fault of the party that's seeking appellate review, they are entitled to a vacator. And I would point to the Eleventh Circuit's decision in the United States v. the Secretary for the Department of Corrections for the State of Florida in 2015 where the Eleventh Circuit held, where there was a PLRA injunction, it was allowed to lapse under the 90-day provisions and the court held that a vacator was proper in that instance because it was not the fault of the prison system that the injunction lapsed. So under that, a vacator would be appropriate. But TDCJ requests that this court hold that it is accepted from the mootness doctrine, that it rule on the merits, and that it reverse the injunction that was entered below. Thank you. Okay. Thank you, gentlemen. We have your case. Completes the docket.